Good morning, Your Honors, and may it please the Court. Dan Bromberg for the defendants. I'd like to reserve five minutes for rebuttal. This is a Lanham Act case about skydiving, and as the plaintiffs have pointed out in their briefs, the appeal is primarily about the remedies. In particular, we're challenging the damages that were awarded here. The jury awarded $3.5 million in damages, which were enhanced to $7 million in the trial court. Those damages were not for lost profits. There was some evidence of some discounts that were given, maybe some lost sales, but the plaintiff didn't seek lost profits. They were allowed to seek disgorgement for that. Instead, the $3.5 million worth of damages that was awarded dealt entirely with goodwill and reputation and maybe some corrective advertising. Now, the evidence of damage to goodwill in this case was vanishingly thin. There were some customers who were told that they had certificates that could be used at Skydive Arizona, who went to Skydive Arizona, and were upset. They were told that Skydive Arizona did not operate with our client, the 1-800-SKYRIDE business, and there's no evidence that they thought any of the worse of Skydive Arizona for that. In fact, one of them, Cheryl Preston, that's the pediatrician who brought her mother for the skydive, she said she actually was treated fantastically. She called her experience at Skydive awesome. The only person, the only indication that there was any damage, any injury to goodwill, was from one person who had received a voicemail, which she thought was from Skydive. She was very upset. She called a woman named Betsy Barnhouse and complained about it. Ms. Barnhouse tried to explain that this was not Skydive Arizona that was involved, but apparently the person didn't listen to her and said that Skydive Arizona wrecked our Christmas. Now, based upon that evidence and the extrapolation that there may have been some people like this person, the jury awarded $3.5 million. Now, there's no way that you can get from that evidence to $3.5 million worth of damage to goodwill. In fact, the plaintiff didn't even present significant evidence of what the value of their goodwill was. They showed that there were a couple hundred thousand dollars that had been invested in advertising. But there's no evidence of excess earnings. There's no evidence of premium pricing. There's no evidence of going concern value that would have told you what the value of the goodwill was, much less any showing that there was any diminution of it. What do you think is the maximum damages the jury, under your view, taking the evidence most favorably to your adversary, the maximum damages the jury could have arrived at? Well, for loss of goodwill, I don't think there's any, Your Honor, maybe nominal damages. But, you know, having, you know, just one or two anecdotes, really one anecdote, and not having any evaluation of the amount of the goodwill, I don't see how there's anything that they could have recovered, certainly not more than the expenditures that they made to establish their goodwill in the first place. And I think under the Lindy Penn case, it's clear that you have to have some reasonable way to compute the damages. You don't get a blank check. Maybe I'm thinking of a different part of the verdict, so correct me if I'm looking at the wrong thing. I understand that the district court, there was a Daubert objection about the methodology. Is that correct? That goes to the discouragement of profits, Your Honor. Okay. So you're talking about just the profits portion on the Daubert issue. Right. Okay. So from your perspective, there's just no way on the goodwill portion, what was before the jury, there was no way for the jury to possibly arrive at that. Is that correct? There's no way to go from the evidence in the record to the award that it made.  And in fact, you know, the plaintiffs never suggested any way to do that. They didn't present any expert who calculated the goodwill. And an oral argument, I'm sorry, a closing argument, you know, counsel basically said fill in some number. And that's what the jury did. They just picked out something out of the air, and that's not sufficient. And obviously goodwill is a somewhat nebulous concept. I think we would all agree with that. It is, Your Honor, yes. What case law do you have, if any, that you believe shows that the approach taken by Judge McGee in this case was an incorrect one as far as the goodwill is concerned? I don't think there's anything directly on point with the goodwill. But I think the key thing to recognize here is we're not talking about sort of hedonic damages here where it's impossible to get any kind of rational estimate. You know, goodwill is something that can be estimated. It is estimated. It is proved in cases. There are methods to do that. None of that was given to the jury here. So I think the evidence on the $7 million in damages, that simply is insufficient to sustain the award. So you obviously discount what was given. You think there was nothing. Based upon what was given, was there anything in there that if the jury disbelieved your take on it and had a different take on it that could have permitted the jury to reach an award of some amount with respect to goodwill? You know, beyond nominal, I don't think so, Your Honor. You know, because, again, all we have is really just one anecdote. And that doesn't give you any basis for making a computation. Certainly the ceiling here would be the amount of money that was spent to establish the goodwill, the advertising in the first place. And that would be hundreds of thousands of dollars. But there's no indication that all of that goodwill was eroded. So it's got to be something substantially less than that. Okay. Help me with this. Now, I'm going to move to a other question. Please go ahead. Did you ask for an instruction on goodwill? Your Honor, I don't think that we did. So we're relying solely on insufficient. You did not. I don't think that we did. Well, the answer is no. You did not ask for it. Yes. No. Yes, the answer is no. Yeah. So we're relying solely on insufficiency. And, you know, we recognize that the standard here is relatively favorable to the plaintiff. But they simply haven't shown how you get from the evidence in the record to $3.5 million. And that's why we think that has to be. And that's what I'm going to get to this analogy. Now, this is a totally different field. Don't get me wrong. In California, for example, if you've got to go through a divorce, you're a lawyer, you're a partner probably in your firm, you know, there's going to be a calculation about the amount of money that the firm made, the amount that you made. And they're going to say, okay, the goodwill, the value, is three times the amount of money that you have made over the past year. That's just an estimate. That's goodwill. Now, it's not based upon testimony that you put on or anybody else puts on. It's just taking the financial information of your law firm. Why is not that analogy, again, a different field, but why is not that concept applicable here? They did have some information about financials. They did have some information about the financials of your client, financials about the other client, I mean, of the plaintiff's. Why is that not relevant evidence in terms of a goodwill calculation? Well, I mean, obviously this is not something that was suggested in the trial court. I understand, but we're talking about a jury here. We're talking here about damage to goodwill. We're not talking about evaluation of the financials. I understand that, but I'm just saying the concept of the way you calculate goodwill is not a science. That's absolutely true, but even in this. If the data was, if there was data before the jury, is there, you've already indicated there's no case law that's going to decide this. So what I'm just asking you is just as a matter of analysis, if information was before the jury, you didn't ask for an instruction, the jury came up with an answer, why is that wrong? Well, I think what you're describing is actually a fairly well-established method of calculating goodwill. It's the capitalization method. You take, you multiply a certain amount by the earnings. Sometimes when you're being more exact, you look at excess earnings. Right. No, I'm being very general, of course. But that's nothing like what happened here. You know, there's no suggestion that there was any kind of calculation like that. And again, we're not determining what the entire amount of the goodwill is here. We're determining what the diminution of the goodwill is here. Right. You know, so there's really no rational way to get from the evidence to the damages. In determining the legal effect of this, are we properly able to take into account that the jury was given this bouillabaisse of data and from that bouillabaisse it can draw out its clams and its shrimps and whatever it wants to? If there's a rational way to make the connection, Your Honor, it has to be some way. You have to be able to explain how you get from the evidence to the conclusion. And Flayniff hasn't done that, and I would submit that they can't. I'd like to – I know that I'm starting to run out of time. I'd like to speak a little bit about the profits. Okay. The problem with the profits is that they can't make the numbers work. The business here was a booking business. So what would happen is my client would get phone calls. They would make reservations, take money for the reservations, get certificates. The certificates would be taken to the skydiving centers. Then the skydiving centers would ask for reimbursement for the cost of the skydive. And there was undisputed evidence that, in fact, that's what my client did, that they were paying the skydiving centers for the services that they were providing. There were hundreds of thousands of dollars that were paid to skydiving centers in Arizona. Those were vendor payments that, as Mr. Freed, the Flayniff's expert, admitted, are cost of goods sold that should have been deducted in determining the profits. Now, they were not deducted. And how do we know that? Well, Mr. Freed gave a series of calculations. Now, some of those calculations included vendor payments. Some of them didn't. When you look at the calculations that included the vendor payments, they don't go higher than $2.1 million. And that is the estimate with the most aggressive assumptions. That's the one that takes the theory where you're extrapolating from the number of customers so that you can inflate at the highest. It's where you're assuming that every single sale that my client made in connection with Arizona was based upon infringement or false advertising, where you're using the 10 percent state interest rate that was never authorized by the court and there's no justification for using here, and when you're assuming that my client was able to attract even more outside of the state customers, 40 percent more than Skydive Arizona itself. So you're saying that if the jury disbelieved all of the deductions and all the things you're talking about, you still don't get to the amount that the jury came up with. What I'm saying is that if the jury, if there is undisputed or indisputable evidence that there were vendor payments that occurred here. Okay, but my question is if the jury chose for whatever reason to disbelieve the offsets, are you saying that you still can't get to the number that the jury got? No. What I'm saying is that the jury could not have disbelieved that my client was making payments to the skydiving center. Okay. So you're saying the jury couldn't possibly have reached that other conclusion. Exactly. It's the nature of the business. There was undisputed evidence of this. Look, there were problems with the records that my clients had. They had records on a Quicken software. It crashed. There were holes in the record. But there were no holes about the vendor payments. On all these questions of damages, did you ask for a special verdict? We did not ask for a special verdict, Your Honor. And did you – you've already said you didn't ask for an instruction on goodwill. What instructions did you ask for on any of these damages issues? I don't think we asked for any relevant instructions on these issues. So we're not relying upon any instructional error. All we're relying upon is the description of the evidence. And did you – after the jury returned its verdict, did you seek a remediator based on the arguments you're making now? We sought a reduction in the award. Yes, we did. To what? I'm not sure what the exact amount was, Your Honor. But I think the key point here is that unless you're willing to assume that there were no – If you had asked, let's say, a reduction to $1 million – I'm just picking that out of the hat – wouldn't that be an indication that you believe that a reasonable jury could have at least reached that amount? I think it might have been, Your Honor, but I'm not sure that we did that. So basically you kind of left yourself exposed with all this stuff. You didn't cabin anything. You just kind of let the jury go. You know, Your Honor, this case was not tried the way that one should try a case. I understand. But still the question here is whether you have damages and profits which are so excessive and so irrational and so unfounded in the record that they can't be allowed to stand. I understand. Do you want to save any of your time here for rebuttal? I do. I'd just like to say one quick thing about the cross-appeal. You know, the plaintiffs here are really overreaching on this. This case was tried on the theory that there were false advertisements concerning Skydive Arizona. If you look at their complaint, it lists 14 different websites. They all concern Arizona. The summary judgment motion is concerned Arizona. The trial concerned Arizona. All the trial court said in the post-trial hearing was, I'm not going to allow you to expand your claims beyond Arizona at this late date. So you just agree with the trial. You agree with the trial judge, right, on that point? I agree with the trial judge. I don't think the trial judge could have done anything else. Okay. You're happy with the trial judge's ruling on that one? On that issue.  All right. Let's hear it from the other side. Thank you, Your Honor. Sid Leach from the Phoenix office of the firm of Snell and Wilmer, representing Skydive Arizona. I'd like to get a few shots in on my cross-appeal. This was a case where I would like this Court to decide, under the circumstances of this case, a district court has the power under this statute to grant a nationwide injunction against a common scheme where it was shown that they used a common template for all of these websites, and the evidence at trial shows that these defendants had websites that falsely represented physical skydiving centers in geographic locations where they had not. But the gravamen of your complaint in chief all dealt with Arizona, though, right? No? That is not correct. Not correct. Okay. Our complaint was based on nationwide deceptive scheme. There was evidence introduced at trial. The reason why the trial was ---- I understand that it was being done in a nationwide basis, but the locus of the services provided were in Arizona. Isn't that correct? No, Your Honor. Let me refer you to the record where if you look at excerpts of record at page 70, which is tab 3, the Court's order on summary judgment, the Court found, quote, as both parties compete nationally for business and more than 92 percent of plaintiff's customers come from outside the state of Arizona to skydive, it would seem reasonable to infer that even websites purporting to offer skydiving in other parts of the country might adversely impact plaintiff's ability to attract customers, unquote. Did the district judge say he didn't have the power to do this? Yes. He did? Yes. And I believe that was an erroneous conclusion of law, Your Honor. Where did he? Point me to where in the record. In the court referred to it as it did not have the power to award profits outside of Arizona and that the case law did not give it the – it did not have the power to grant an injunction except to restrain the act relative to the plaintiff. I thought the court focused on the materiality of what had been heard. Was I mistaken on that? Your Honor, this case – Right. I thought that she said that the consumer surveys and other such things did not establish the materiality of what had been heard. Is that wrong? I think that's wrong. And, Your Honor, there's one thing about the way this case got tried in pieces that I think is relevant here. The court granted summary judgment on the Section 43A claim relating to the false websites. So that was not part of the trial. The trial then focused in only on the trademark infringement claim, which was, of course, the – limited to basically Arizona-centric. But then both parties agreed that there were certain questions for the court to decide at trial. That evidence was not presented at the same time, but a subsequent hearing was held presented for the issues that the court was going to decide. And that then broadened back out to the false websites, the false advertising Section 43A claim. The evidence was always that this was a nationwide deceptive scheme. And the defendants don't dispute that. In fact, in their brief, they concede that these websites in other States were based on a common template where they copied the identical language. Now, this was all based on Flynn's declaration. Is that correct? Or for the most part based on Flynn's declaration? No. Not as far as the false websites were concerned. The Flynn's declaration is the one thing on the materiality that the court referred to in its summary judgment. Right. And I can address that. But the point we're talking about right now is whether the evidence on the false advertising claim was presented that was focused on the nationwide scheme. We had testimony from a representative of the United States Parachute Association who testified that this was a problem nationwide, that they met with these defendants, that they tried to convince them to change their websites. Before the jury, that was relevant to the question of intent and willfulness, that the jury was to decide as far as the advertising claim was concerned or the Section 43A claim. Well, we'll take a look at that in greater detail. I want to change the focus here for a minute. Judge Bergia doubled the amount of actual damages, and it appears to me from looking at the transcript that she really did it based upon the, in quotes, willfulness, in quotes, of the acts, and that it had an element of punitive damages to it. Whether you agree with that or not, I'm struggling with how you reconcile her doubling that with the VASF jurgens and the ALPO pet foods cases. Can you help me with that? Yes, Your Honor, because I believe that the case in Mare Brewing is controlling here. In that case, this Court specifically addressed the language in the statute that said any award shall be compensatory, not a penalty. In that case, the Court held that it involved a trademark infringement where the defendants did use the trademark on beer and the plaintiff used it on whiskey, and there was conceded that there was no possible competition, and the plaintiff lost nothing as a result of the defendant's acts. But nevertheless, the Court said that on a theory of unjust enrichment, that provision of the statute does not prevent the Court from awarding profits in that case. Well, I guess what my concern is, if you look at VASF, it indicates that enhancement of damages is only available to ensure that the plaintiff receives compensation. A jurgen says that to penalize the defendants for appropriate conduct is an abuse of discretion. And ALPO talks about, again, how basically the concept of willfulness doesn't work. You know, Judge Merguia is an excellent trial judge and, of course, is now a superb colleague. But the question I'm dealing with is this concept of whether willfulness equals punitive damages. If it's punitive damages, I'm struggling with how we can award the doubling of the damages. Compensation, great. I get that. But doesn't this really smack of punitive damages? I would disagree, Your Honor. The statute gives the Court very broad discretion. So if the judge decides it's inadequate or not good enough, the Court has – I mean, the statute looks like it's almost unbridled discretion until you get to that sentence that says it should be compensatory and not a penalty. Right. In this case, we've all – we all recognize that the evidence of the plaintiff's damages was difficult to prove. Right. That this was – and the Court referred to the voluminous evidence presented as stellar reputation. Forgive me. She didn't say that, you know, I'm going to double this because the nature of this case is such that you really can't get very good figures on damages, so there probably was more there. And to fairly compensate, I'm going to double it. What she said was, this Court notes the jury's finding of willfulness to emphasize the purposely deceitful nature of the defendant's conduct. The defendant's seeming disregard for the people they harmed or the reputation they sullied convinces this Court that an increase in the amount of actual damages is proper. If that's not punitive, what is it? No, that is relevant to the predicate upon which the Court opened the door to increasing the damages. I believe this Court's case law holds that you have to have a finding of willfulness before the Court has the discretion to up the damages. Well, admittedly, it's all somewhat semantic, but given the tenor of the language that my colleague has just cited, how can you come to a conclusion that it was anything other than to punish these folks for their conduct? Well, because the evidence at trial, I think, would have supported a ward greater than that, and that was the other side screaming that what was already awarded was absurd, because there was no evidence to support that. I mean, there's a generous award, and, you know, whether it's okay or not legally, that's something we have to decide. But the reality is this case doesn't really stem on whether there was a paucity of damages awarded for, you know, basically compensatory damages, does it? In that regard, the Court spoke about the command from this Court to make sure that the damages were not, you know, inadequate, and to make violations of the Lenamec unprofitable, and the commands from this Court that you should not – it's important you not grant inadequate remedies in these cases. The Court spoke about willfulness. But you believe that if you just – let's say for a moment that, hypothetically, of course, that we do away with the doubling of the damages, hasn't your client been generously compensated based upon the calculations made? If nothing else has changed, hasn't it been generously compensated? Whether it can collect them or not is another matter. But generously compensated based upon what the jury decided? I would say not, Your Honor. And I would say that you – if you asked that same question in the Merrill Brewing case, you would get the same answer, I would hope, because in that case, the plaintiff lost no sales to the defendants who were violating the Lenamec by selling products on noncompeting products. What other evidence would you cite that was not considered by the jury that would have led to greater compensatory damages? The amount spent on advertising would be – That was not considered? No, that was – I think that that was – that was evidence that was in the record. Okay. And I – I'm sorry. I may not have missed one of your questions. What I'm saying is, let's take the – all the evidence that was given to the jury. The jury came up with these awards. The other side is very unhappy with it. They say it's way, way, way too much. But bottom line is, that's compensatory, okay? Whether it's right or not, we have to decide. What I'm struggling with is, once you put all that in, what more would you have given to the jury? What more could be considered to permit the award to be rounded up, or in this case, doubled, that has nothing to do with punishing these folks for their appropriate conduct? Let me ask you this question. Answer that with another question. I get to ask you the question. Yeah, I know. But how would you construe this statute any other way? Because the statute says that the fact finder finds the damages. I know. But the statute says the court has the discretion to increase them. And Juergen says that to penalize the defendants for appropriate conduct is an abuse of discretion. We're bound by that, are we not? That is correct. We've got a Miller situation. We can go on bonk and change it or something. But other than that, I don't see how we get around that. Well, you can – you can affirm the judge's decision on any ground. Assuming. Assuming. Assuming that it doesn't violate our existing law. And that's what I'm struggling with. Well, in this case, I believe that the evidence showed that the plaintiff had invested $3.5 million in land and buildings, $5 million in aircraft, $5 million in a vertical window. But all of that went to the jury, didn't it? Yes, it did. And the jury used that as part of the basis for its decision on the amount awarded as compensatory damages. Again, what I'm struggling with here is, once that's all done and Judge McGee has said, you know, I'm going to double this. And I'm going to double it because of the willfulness of the conduct and the other language that my colleague, Judge Rakoff, cited there, to me sounds like she's saying, these are really bad guys. I'm going to punish them. I don't think she went so far as to say, I'm going to double it because of that. What did the language mean then that Judge Rakoff quoted? What was she saying? She was, after she had already discussed previously the opinion, the enormous evidence about the stellar reputation, as she referred to it, then she referred to this Court's law that their objective is to achieve deterrence and to make violations of the Landmark Act unprofitable. And also she had previously discussed in her summary judgment ruling that she had to find willfulness in order to up the profits, that at that point she was, she had to say that she had the predicate for increasing the profits because of willfulness, and the evidence was particularly strong, as she said.  She begins this discussion by saying that all, quote, although willfulness is not a prerequisite for increasing an award of actual damages. This Court notes that the jury's finding of willfulness, this Court notes the jury's finding of willfulness to emphasize the purposefully deceitful nature of the defendant's conduct in this case. And she goes on with the language I quoted before, which I, you know, I think Judge Smith fairly characterized it as saying these are bad people. They were. Well, that may be, but the statute says that that can't be the basis for punishing. I disagree. Being a bad person is not permitted under the statute, right? With all due respect, Your Honor, I believe you have to read the statute as a whole. You're focusing on one sentence. The statute says plaintiff is entitled to recover damages. Then the statute says the Court has the discretion to increase the amount found as damages up to three times. How can you read that statute? But on what basis, though? I think under, in order to effectuate congressional intent. But isn't the real basis, I mean, anyone who has looked at the history of Lanham Act cases knows that the problem that Congress was always concerned with is the difficulty of showing actual damages in these kind of cases. That's why I'm not too sympathetic to your adversary's position when they didn't give any guidance to the jury, didn't request any guidance to the jury, and then they're saying, oh, but look at this amount the jury found. But that's what Congress was concerned about, and that's why they wanted to give the judge ability to put in other kinds of damages. Not, they expressly said they weren't interested in punishment. Yes. And that's why you can't put me in the catch-22 situation of saying, well, if that evidence was before the jury, then you're assuming there must be some other evidence that the jury didn't consider that the court could rely upon in order to increase the damages. And I say you can't read the statute that way. Well, ultimately, ultimately, we have to look at Judge Mergia's language, what she cited, and then we look at these cases that I cited to you before. And the question is whether, in light of her language and the cases, we're bound to follow what our circuit has previously said with respect to this type of thing. In any event, I respect the fact that we could have a long, long, long discussion. We appreciate your argument. We'll give the other side a minute to respond. We took you over a little bit. But thank you for your argument, and let's hear a brief rebuttal here. Your Honor, thank you very much. I'll try to be very quick. I think you're absolutely right that there's no indication that Judge Mergia was attempting to compensate. This clearly was punishment. It's clearly improper under both the statutory language and under the case law. I think it's indicative that Mr. Leach did not indicate how you could get from the evidence of goodwill that was in the record to the amount that is there. Now, Judge Rakoff, you said that you didn't have much sympathy for us because it's difficult in Lanham Act cases to prove damages. That's correct. That's why Congress has created a panoply of remedies to deal with that, not only enhanced damages, but also statutory damages, disgorgement of profits, attorney's fees. All of those remedies were applied in this situation. It turns the statutory scheme on its head to allow the plaintiff to recover damages for which there is no way of calculating and get each and every one of those additional remedies. I think, unfortunately, your time is up. Two more quick points, Your Honor. I think we probably have already seen them in your excellent brief. Thank you very much. Thank you very much. All right. The case of Skydive Arizona v. Quattrochi is submitted.
judges: Rakoff, Noonan, Smith